5 0 1 4 9, United States of America v. State of Texas. Mr. Nielsen. Chief Judge Richman, and may it please the Court, Aaron Nielsen on behalf of Texas. Well, a lot has happened in this case since Texas filed this Notice of Appeal just over a month ago. Given the unusual posture we find ourselves in, and with the Court's indulgence, I hope to be able to make three broad points this morning. First, I'd like to step back and discuss, from Texas' perspective, how we got here. Second, I intend to answer Chief Judge Richman's questions that she asked at our previous oral argument. And third, respectfully, everyone is moving very quickly in this case, and several of the conclusions in the Court's stay order Texas submits rest on inaccurate factual premises about how SB 4 operates. So I want to begin with how we got here. And I don't think anybody disagrees that there is an unprecedented border crisis. And by that, a couple of points I would like to make. First, it's unprecedented in volume. There's always been people who cross the border, but before we talked about hundreds of thousands, now we talk about millions. Before we talked about tens of thousands of unaccompanied minors, now we talk about hundreds of thousands. Before we talked about a few countries, now we talk about essentially all countries. But beyond that, it's also unprecedented in the sophistication of the enterprise. The cartels have essentially got this down to a science. There's a logistical supply chain, and they move people through the supply chain, where they make a great deal of profit for themselves. And once they've built the supply chain, they can use that for other things as well. Fentanyl, other sorts of narcotics, weapons, you know, we worry this FBI director says there's an affiliation with ISIS, and so on. So we're dealing with a greater volume, but a greater sophistication and greater violence on both sides of the border. And for years, this border crisis has been kind of building up and happening, and Texas all along has been doing everything within our power to encourage the federal government to do what Congress has directed and address the border crisis. And the answer that we have received at every turn is, we don't have the resources. We get that. We understand that. But here, Texas has come forward with additional resources, saying, let us protect the border. And rather... Sorry. If the answer is just, we don't have the resources, why hasn't the federal government taken Texas up on its generous offer to say, hey, here are our resources, we'll do it for you? What have they... They're not saying yes, they're saying no. Correct. They're not just saying no. Respectfully, they're destroying our Texas's property. They're saying and suggesting awful things about Texas at the United States Supreme Court, which are demonstrably untrue. And they're suing us. They're outright suing us. My only point was, you said it was just, in response to your statement, it's just money. If it were just money, it seems like they'd welcome your help, but they're not. They're not welcoming our help. So I went back in the events of this argument and read dozens of preemption decisions from this court and the Supreme Court. And as far as I can tell, this is the first situation ever where a federal judge has found, as a matter of fact, that federal officers are deliberately and, quote, disingenuously not enforcing federal law. And from Texas's perspective, this puts us in dangerous and uncharted territory because we are in a situation now where the court is trying to figure out implied conflict preemption, in other words, what Congress would want to happen, though Congress hasn't said so, where the executive branch isn't enforcing the law. What Texas has done here, and that leads us to SB 4, what Texas has done here is they have looked at the Supreme Court's precedent and they have tried to develop a statute that goes up to the line of Supreme Court precedent but allows Texas to protect the border. Now, to be fair, maybe Texas went too far.  But that's the context of which we are here. Texas has looked at the Supreme Court precedent and the laws that Congress has enacted and has tried to develop a law that goes up to the edge but no further. And that leads me to Your Honor's questions from last oral argument. I think they're going to be helpful to decide whether Texas has gone past the line that  First, Your Honor asked about SB 4's Port of Entry provision, Article 5B-002-E1. Specifically, Your Honor asked, what would happen if Texas delivered someone to the Port of Entry, to the United States at the Port of Entry, and the United States says, okay, all right, go back into Texas? Can Texas re-arrest? What do you do in that circumstance? I have some disadvantage because no Texas court has yet interpreted SB 4. So I can't give you chapter and verse what the Texas judiciary says about this. But I can say on behalf of the Office of Attorney General, we have looked at this provision and it is our position that in that circumstance that Texas could not re-arrest the person. The reason so is Section 5104, which says that an alien must refuse to comply with the order, which would not be the case if the United States or Mexico says no. There would be a break of the mens rea and the person wouldn't be subject to SB 4. Now, to be sure, I think if everybody, it's not a secret that if federal law allowed Texas to go further, Texas would go further, but that is the line as Texas perceives federal law and that is as far as it goes. Second, Your Honor asked, what would happen if someone enters Texas via Arizona, I think was the example that you used. In other words, they didn't directly come into Texas, they came via another state. That person would not be covered because they did not directly enter Texas from a foreign nation. That's Section 5102. But beyond that, I would point the court to ROA 319 and 315. That's about how this law is going to be actually enforced. There wouldn't be probable cause in almost all cases unless a Texas officer sees somebody crossing the border. So the separate reason that Your Honor's question probably would not come up very often in the real world is obviously you wouldn't see somebody crossing the border. Well, let's suppose a woman files out a complaint. She says, my domestic partner has been violently beating me and I want you to arrest him, and by the way, he crossed into Texas illegally from Mexico. Correct, Your Honor. That might very well be. That's why I tried to say it generally. That wouldn't be a Texas officer saw them. That would be... Correct. Correct. So as a general matter, you would have probable cause if you see, for a misdemeanor, if the officer sees. There could be other circumstances where you would have probable cause, but in the main run of cases is what we're talking about here for a facial challenge. A lot of the situations, a lot of the kind of concerns, it just wouldn't come up because the officer is going to see the person. Your Honor also asked a question if there is any history of states using their police powers with respect to entry. The case I would point the court to is Mayor of New York v. Milne from the Supreme Court, New York, 36 U.S. 102. Now this is from 1837, so we are back there, and I understand that. No, I remember Justice Scalia's dissenting opinion. Go ahead. Sure. And there, Your Honor knows the case, New York said that if you were going to bring people into New York from foreign countries, you have to have a registry. I don't think you call it a registry, a list of people, and it had to say where they were from, and you had to essentially post a bond that there wouldn't be a burden on the state's fiscal matters. And the Supreme Court upheld that law against a challenge. The challenge against it was this is a regulation of commerce, this is left to the federal government, and the Supreme Court said no, this is an exercise of the police power. Now I recognize that, of course, even if it's a matter of the police power, it can still be preempted. That doesn't mean that just because it's the police power it can't be preempted, but that does mean we're out of one of the possible theories of field preemption is that the states can never do this. No, they can do this, that's what the Supreme Court said, it's part of the police power. Now the question only is whether Congress has sufficiently allowed it, either as a matter of field preemption or as a matter of conflict preemption. So just as baseline, there is a police power issue here, so we're back to a kind of ordinary space of preemption. So now I'd like, if I may, and I appreciate the Court's patience, I would like to talk about a few of the observations about the stay opinion. We appreciate the Court's work on a very expedited process to issue that stay opinion. I think there are a few points where the Court reaches a wrong conclusion because it starts with an inaccurate premise. We talked about one of these already, and that is Texas does not remove anybody. These are return orders, and Texas will take the person to the port of entry. Under that understanding, I'm looking at page 17 of the Court's stay opinion, where it says the Court envisions a defendant being, quote, removed before federal proceedings that would permit her to remain in the U.S. lawfully had been initiated or concluded. That theme, which is an important theme about federal rights and federal defenses, is throughout the Court's stay opinion. But because nobody, Texas doesn't deport anybody, Texas takes them to the port of entry, and the United States then decides what to do, that issue just isn't going to come up. If the United States says we're not sending you to Mexico or some other place because there's pending proceedings, well, there you go. Let me ask you about that factually. You're saying the United States, when someone wants to leave the United States and cross into the Mexico border, the United States decides whether they get to or not? What I'm saying, Your Honor, and again, I point the Court to the declarations that we have attached and also the text of Article 5B02E1, is Texas takes the person to the port of entry. As a legal and as a practical matter, at the port of entry, the United States is there. So if the person says, you know what, I have a pending asylum claim, well, the United States is not going to send you to Mexico at that point, and we've also heard that Mexico might not very well take the person, two things that would stop a subsequent prosecution by the State of Texas. So I think that's critical about this, is it's portrayed as Texas is, you know, ourself, just like flying people off to some other place, and that's not accurate. And the port of entry provision, and especially the declarations of how Texas understands and intends to enforce SB4, that's not how it's going to be. It's going to be people are taken to the port of entry, and the United States controls the port of entry. And I think that's important, because as I understand Your Honor's stay opinion, that was a overarching concern kind of throughout, is that federal defenses and federal rights won't be protected under SB4. That's not how we understand the law, and I think under that understanding, some of Your Honor's concerns hopefully are assuaged. So you're going to take 150 people back to Eagle Pass? You're going to take, let's say, 150 people at a time back to Eagle Pass? Yes, or some other port of entry, yes, Your Honor. And then the federal government is going to process them, is that how you? Yes, Your Honor. The federal government is going to say, here's your notice or whatever, you can stay in. And so then Texas, what's the statute, what has the statute accomplished? I'm just curious. Yes. So, I mean, this already happens with Texas's trespass provisions, where if somebody trespasses onto Texas land, Texas will then arrest that person, and then Texas will coordinate with the federal government. So what would happen in that scenario, and again, it's hypothetical, so I'm just imagining, but what would happen is Texas would take the person to the port of entry, presumably the United States would then put them into the United States system, they would process them, and then they would give them a hearing date of some sort, I don't know when it will be, to appear for your federal proceedings. Texas, under the position of the Attorney General, would not be able to prosecute that fine. They haven't crossed the border again. I'm just, actually, I'm just really curious. When you take the trespassers to the border, does the United States say, go ahead and go back into Mexico? Does Mexico say, yeah, come on, what happens when that happens? Yeah. So, again, I don't claim to be the world's greatest expert on that. I have asked how that works, and my understanding is Texas will take them to the federal government, and the federal government will then process them, however the federal government so chooses to process them. So I suspect, based on, again, I don't want to claim encyclopedic knowledge of this, there might be other examples, the people I have spoken to, including on the border, have said what then happens is the United States says, go into the country, and here is your hearing date, which might be many years in the future. I don't know if that's always the case, but that is, at least that was portrayed to me. So they don't normally go back into Mexico? I don't believe so, Your Honor. They stay in the United States, even though Texas is taking them as trespassers? Yes, Your Honor. Now, to be sure, Texas, if you commit violation of Texas trespass law, you can be incarcerated for that first, and then there will be a detainer over to the federal government. I see that my time has expired. I just, if I may, just a couple more points. I would also talk about Ex parte Young. As I understand it, this is the first time ever that a federal court, a federal appellate court has said that the United States can bring an action under Ex parte Young. I would point to the court to just some of the implications of that. I, you know, we went back and we said, how many times has Congress enacted a statute allowing the federal government to seek injunctive relief? And there's lots of them, the Voting Rights Act, the Sherman Act, there's an Anti-Fraud Statutory Injunction Act. These are specific statutes where Congress has empowered the federal government to seek injunctive relief. If they could just go under Ex parte Young or NRA DEBS, all of the statutes serve no purpose at all. What is the point of any of those statutes? Why do we worry so much about the United States' cause of action under the Voting Rights Act if they don't need to do that? And in another case that will be in front of this court, the Embank court in the district court, as soon as this court issued its decision, the stay order, they filed a notice of supplemental authority saying, well, we don't even need a cause of action to enforce non-self-executing treaties because there you go. That, respectfully honored, that can't be correct. The United States, there's many, many times where Congress has provided a specific cause of action. I don't think that NRA DEBS or Ex parte Young is a massive workaround that allows the United States to get around all of those statutes. I also, but even if I'm wrong about all of that, and the court says, well, we should treat the United States as if it were a private person for purposes of Ex parte Young, a private person in the position of the United States could not also bring an action under Ex parte Young here because they are not subject to SB 4. So for the same reasons that the other plaintiffs couldn't bring a cause of action in Ex parte Young, neither could the United States. I have a few more points. I'm happy to discuss them during rebuttal if the court has no further questions for me now. Thank you. Thank you, Your Honor. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. In Clark v. Tarrant County, this court adopted a six-factor test to determine whether a government actor is entitled to immunity under the 11th Amendment of the U.S. Constitution. However, in this case, the district court below did not apply or even consider the Clark factors when it determined that District Attorney Hicks is a county official not entitled to immunity protection under the 11th Amendment of the U.S. Constitution. Because the district court erred in not applying Clark and not dismissing this action against District Attorney Hicks, District Attorney Hicks respectfully asked the court to reverse the district court's holding for two reasons. First, contrary to the district court's decision, District Attorney Hicks is a state official entitled to immunity protection under the 11th Amendment of the U.S. Constitution and is not subject to the Ex parte Young exception. Second, even if this court were to find that District Attorney Hicks is not a state actor and not entitled to immunity protection under the 11th Amendment, the Appellees, specifically the County of El Paso and the organizational plaintiffs, do not have standing to bring this lawsuit against District Attorney Hicks. Now, turning to the Clark factors, a review of the laws of the state of Texas revealed that district attorneys are indeed treated as state officials under the laws of the state of Texas. In fact, the definitions under the Texas Code of Criminal Procedure for attorney representing the state, attorney for the state, and active duty state attorney under Article II of the Texas Code of Criminal Procedure include district attorneys within those definitions. Moreover, under Article V, Section 21 of the Texas Constitution, district attorneys, just like District Attorney Hicks, are commissioned by the governor. In fact, in this case, District Attorney Hicks was appointed by the governor of the state of Texas. In the event that there's a vacancy or there's a creation of a new district attorney office in the state of Texas, it is not the county that appoints district attorneys. It is the governor of the state of Texas under Chapter 41 of the Texas Government Code. In fact, with certain exceptions before assuming the duties of office, district attorneys in Texas must give a bond that is payable to the governor, not the county, not the county in the office of the Texas Comptroller of Public Accounts. The state of Texas is also a major source of funding for the district attorney's office. It's not the county. In fact, under Sections 41.013 and 46.003 of the Texas Government Code, 80 percent of a district attorney's salary and most of its funding actually comes from the Texas legislature. It doesn't come from the counties. As an example, if a district attorney is in dereliction of duties and is not performing the duties of his or her office, a clerk has the statutory obligation to notify the Texas Comptroller of Public Accounts, and that office is obligated under the law to withhold the salary of a Texas district attorney, not the county, not Commissioner's Court, or a county judge. In fact, under Chapter 43 of the Texas Government Code, most of the expenses that are incurred by a Texas district attorney, whether it's travel, telephone, postage, or other matters arising out of the duties of the office of the district attorney, are reimbursed by the Texas legislature. They're not reimbursed by the county or any local office. Aside from that, in elections, district attorneys are not tied to county lines. They are tied to judicial districts. District attorneys, just like District Attorney Hicks, are not district attorneys that only serve for a specific county. In this case, District Attorney Hicks is the district attorney for the 34th Judicial District of the State of Texas. That means that he's the district attorney not just for El Paso County. He's the district attorney also for Culberson County and Hudspeth County. That's the 34th Judicial District. In fact, this court in Clark v. Tarrant County found that if a government officer is tied to judicial districts for purposes of elections, that officer is considered a state official for purposes of 11th Amendment immunity. In fact, district attorneys in Texas derive their constitutional power under the judicial article, which is found in Article V of the Texas Constitution. They don't derive any powers under Article IX, which is expressly reserved for counties. Again, to demonstrate the fact that district attorneys, like District Attorney Hicks, are state officials not bound by any county. District attorneys, as the court knows, represent the State of Texas in all criminal proceedings. They don't represent the county. They don't represent county officials. They represent the State of Texas. That's the announcement that they make when they show up in court, that they represent the State of Texas in all criminal proceedings. That's found in Section 43.120 of the Texas Government Code and Article 2.01 of the Texas Code of Criminal Procedure. They also work in tandem with the Texas Attorney General to prosecute cases. They also have an obligation, at the request of the Attorney General, to provide specific reports to that office. They don't have that same obligation to the county. Now, if this court were to find, as we humbly submit that it should, that District Attorney Hicks, like all district attorneys in Texas, are state officials entitled to immunity under the 11th Amendment, we would submit that the Ex Parte Young exception does not apply to District Attorney Hicks for two reasons. First, appellees have to demonstrate that District Attorney Hicks has a particular duty to enforce SB 4, and that he's expressed a willingness, a demonstrated willingness, to enforce SB 4. Those two factors are factors that must be met and satisfied by appellees. That's their burden. That's what this court held in Texas Democratic Party v. Abbott. It's the plaintiffs that have that burden. There's nothing in the statute of SB 4 that compels district attorneys to prosecute cases. District attorneys have prosecutorial discretion. They don't have to enforce every single case that comes before them, and what's conspicuously missing from the complaint filed by appellees is that there's no allegation that District Attorney Hicks has demonstrated a willingness to enforce SB 4. They made that allegation against the director of the Department of Public Safety, but that allegation is conspicuously missing in their complaint. It's not found in their motions for preliminary injunction. That was not anything that they argued in the district court below. For these reasons, District Attorney Hicks would respectfully ask the court to reverse the district court holding and dismiss him from this lawsuit. Thank you. May it please the court, Daniel Tenney for the United States. Nothing that has happened this morning provides any basis for deviating from the analysis set out in this court's stay opinion. I'd like to start with counsel's effort to rewrite Texas SB 4 from the podium with regard to the removal provision, and I have a few responses to that. The simplest is that if the court is persuaded that the criminal provisions of SB 4 are preempted by federal law, as indicated it was likely to do in the stay opinion, then really nothing that was said about the removal provisions matters, because the removal provisions kick in only at the end or sometimes at the outset of the criminal proceedings, and if the criminal proceedings are invalid, then the court could additionally, as it properly did before, hold that the removal provisions are improper. But the fact that they're trying to change the way the removal provisions are implemented actually wouldn't change anything about the disposition of this appeal, which would be that the preliminary injunction would be affirmed in its entirety. But I would like to address counsel's representations on their own terms as well. The statute says that there will be an order that requires the non-citizen to return to the country from which the non-citizen entered the United States. They now say, I guess that you don't actually have to do that, that maybe you just go to the port of entry and that's good enough. The declaration that they filed in district court, this is the Escalante Declaration, I'm on page 316 of the record. On appeal, paragraph 15, if Mexican authorities do not accept the entrance of an alien subject to an order to return, the escorting DPS officer will deliver him to the American side of a port of entry and observe the alien go to the Mexican side. Upon witnessing the alien's cross to the Mexican side of the international bridge, the officer will consider the aliens to have complied with the return order and will cease monitoring the alien. So I mean, they say that this court's decision was premised on an inaccurate perception of the facts. The district court properly based its ruling on the text of the statute and of the declaration submitted by Texas itself about how the statute would be implemented. And so there's no basis for concluding that the district court erred or abused its discretion in issuing a preliminary injunction based on an argument that counsel was not even aware of at the stay stage, much less presented to the district court. And finally, on that point, even if the court were to accept this new representation, I'm not sure I understand exactly how the statute works. It seems like an order purporting to require you to return to Mexico is actually just an order saying if the United States removes you to Mexico, then you have to go. I'm not sure exactly what that accomplishes or what that order means, but to the extent that it has any force in effect at all, it would be preempted for all of the reasons that this court well explained in its stay order. If the statute said the state of Texas will return the subject of the removal order to the port of entry, would that be feel preempted in your view? I guess I'm not sure I understand the hypothetical. Just imagine that the statute said exactly what Mr. Nielsen said verbatim. It just said that upon an order of removal, DPS will take the individual, return them to the port of entry and surrender them to the United States Customs and Border Patrol. Is that feel preempted? I mean, I guess you couldn't call it an order of removal anymore. Fine. Call it whatever you want. Call it a return order. I mean, I'm just struggling. If this is still at the end of a criminal proceeding based on unlawful entry, then it is feel preempted. So let's unpack them, right? Because the Arizona court requires us to unpack and go provision by provision. So we can talk about arrest in a minute, but you asked, you wanted to start with the return order and so I would like to understand the United States government's positions as to return orders. If the return order said the individual subject of the return order shall be returned to the port of entry and surrendered to the United States Customs and Border Patrol, feel preempted yes or no? I guess I'm still trying to understand the hypothetical. Okay. What's confusing about it? The premise on which the return order, I mean, first of all, you're calling it a return order. It sounds like it's no longer a return order since it doesn't require them to return. And so then it's saying under some circumstances, a Texas court, I guess, is issuing an order requiring a non-citizen to go to a port of entry. And so the question that I have is, is what are those circumstances? Because on the, on the text of SB4, what happens is there's a prosecution for unlawful entry. And we think that having prosecutions for unlawful entry is field preempted. And if the, the order that comes at the end of the day is, you know, imprisonment or returning to a port of entry or anything else, we think that state's imposing consequences for unlawful entry is field preempted. So if that's the premise, then my answer to your question is yes. But I was sensing that that wasn't the premise and that's why I'm hesitating. Yeah, I understand. So why don't we take a really simple one? It's not a hypothetical, actually, it's a very simple, concrete example. So there are currently 1.3 million outstanding orders of removal issued by the United States government. So there are 1.3, that's the United States government's statistics. So presumably the number is at least that big, could be bigger, but we think there's at least 1.3 million people in the United States with final orders of removal. Some number of them presumably are citizens of Mexico. So take a citizen of Mexico who undisputedly crossed outside of a port of entry, is statutorily inadmissible, is removable under 1225, has completed removal proceedings and yet is still in the United States. That person is arrested under SB 4, is ordered return to the port of entry and surrendered to the United States government, field preempted, yes or no. Super simple. I'm trying to make the easiest possible case as concrete as you possibly can make it to strip out any confusion. Is that field preempted? Yes. The whole statute is field preempted. And how is that field preempted if the United States government has determined that the person shall be removed? Well, I mean, the premise of field preemption, of course, is that the federal government has occupied the field such that the states are not supposed to act in that area. Now, there are ways, of course, that Texas can participate under the INA if Texas encounters an individual, notifies the federal authority and allows the federal government to carry out the removal, which is a process that involves coordination with another sovereign, that involves a determination of the proper country of removal and sometimes the exercise of discretion. There are ways that Texas can participate. But if Texas takes it upon itself to carry out the removal order or to arrest the person and take them somewhere that the federal government isn't asking them to go, then yes, that is still field preempted. Well, the federal government, I think, did ask them to go, right? The federal government ordered them removed. Final order of removal. So we've already adjudicated asylum, refugee status, convention against torture, everything. The federal government has determined that this person shall be removed, just hasn't gotten to it yet. So that's what I'm sort of hunkering down. Perhaps I'm the one that's confused by your position. Well, I guess I was talking about when the federal government carries out a removal order, it coordinates with the nation that the person is going to be removed to. It arranges for transportation. It makes determinations about whether removal is appropriate. I understand there may be a final removal order. It may be subject to appeal. There may be discretionary determinations. Voluntary departure is sometimes an option. So I guess my point is just that process is a federal process. And if Texas does the precise things that, I mean, your hypothetical is again removed from SB 4 because what SB 4 says is that that person would be charged with a Texas crime brought before a Texas court and that there's no room in the INA for that. Now your hypothetical has deviated from that and now seems to be, I guess if I'm understanding the hypothetical, it's that they're not doing any of that. They're not going to state court. They're just arresting the person and bring them to a port of entry. That's a very different case and that would be a question of whether that's sufficiently cooperative to fall within the INA. But that's not exercising regulatory authority as Texas has purported to do through SB 4. To be clear, I'm not deviating at all from SB 4. I'm asking you, there are two different provisions that we're talking about and I'm trying to isolate one at a time because one of the things that's frustrating and I think has led to some of this court's treatment of the position from the United States is that when I ask you a question about arrest, you talk about removal or return and when I ask you a question about removal or return, then you talk about arrest. Now it's the government's position having achieved perhaps a completely unprecedented as far as I can tell, and you're welcome to tell me that I misunderstood or mis-researched something. But as far as I can tell, never in the history of the nation has the United States achieved what they've achieved in this case, which is a facial invalidation of a statute that never went into effect with no cause of action. I mean, it's an extraordinary achievement that the United States has won and in order to preserve it, you have to show me that every single application of every single provision is unconstitutional in every single way. So what I'm trying to get to is can we isolate one particular provision and just talk about that one? If you'd like to talk about arrest, we can talk about that. Honestly, it's your case and you can litigate whichever way you'd like. I'm just trying to understand one provision at a time since that's the burden for the government. I appreciate that, and I would like to zero in on the provisions. I would like to just say one thing about the premise of your question, that Arizona is of course an example of an injunction against a law that had never taken effect without a statute. I'm so grateful that you brought it up because I don't understand this position at all. So let's read what the Supreme Court of the United States in its majority opinion said in Arizona. Right. Number one, they said one provision is field preempted, only one. And then they go provision by provision until they get to section 2B and they say this. The nature and timing of this case counsel caution in evaluating the validity of section 2B. The federal government has brought suit against a sovereign state. The federal government has brought suit against a sovereign state to challenge the provision even before the law has gone into effect. There is basic uncertainty about what the law means and how it will be enforced if I can pause and editorialize for a moment. Mr. Nielsen has said he has uncertainty about it. The chief judge has said that she's had uncertainty about it. And today you've said that you've had uncertainty about it. And in Arizona, the Supreme Court said they have uncertainty about it. At this stage, without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume section 2B will be construed in a way that creates a conflict with federal law. So you hang your hat on Arizona. Arizona this and Arizona that and Arizona the other thing. They field preempted one provision that was about alien registration. That was from Hines in 1941. And everything else, they did a thing totally different than what you've asked our court to do successfully, to your credit, successfully, to your credit. But that's not at all what happened in Arizona. Okay. I do want to go to provision by provision. And I don't think what we're doing here is any different from Arizona. The only point I was making about Arizona was you had asserted that the government had never before achieved an injunction against a provision that had never taken effect without a statutory cause of action. Right. That was the entire statute. What I meant was the entire, every single provision, every single application, forever and all time. Okay. Okay. I'm not entirely sure why that makes a difference, but I'm happy to go provision by provision. And I think your references to arrest highlight a problem. Can I pause you for a second? Because it's really important. It makes a difference because the Supreme Court of the United States, in your best authority, like everyone in the courtroom agrees that Arizona is your best case, including me, and in that case, they did not give you what you're asking us to do. They did not give you field preemption as to every provision of a statute passed by a sovereign state's legislature before it went into effect and was applied to anyone. They didn't give that to you. And so that's what I'm hung up on. And I'm trying to ask why it is that you want to so radically extend the Arizona rationale in this case, instead of answering the hypotheticals that you, your friend on the other side, your friends from the bench, like everyone's asking the same question, which is, gosh, how would this, how would this actually play out? Is it actually going to be a surrender to the port? Is it actually going to be a removal? How is arrest going to work? What are going to be the nature of the cat claims? What about refugee status? How is this all? Who knows? And the Supreme Court of the United States said, who knows, is a really important reason not to preempt a statute before it goes into effect, and I don't understand why we wouldn't do the same thing here. Okay. Well, let's go the way the Supreme Court went, and let's go provision by provision. So there are three main operative provisions, and then there are some ancillary ones. So, I mean, the thing that I think is causing a lot of the confusion is a reference to an arrest provision. As this court pointed out in the stay opinion, there isn't a freestanding arrest provision of this statute. And if there were, it might be analyzed in the same way that Section 2B was. But there isn't. What there are are criminal provisions, and then, in fact, there are just criminal provisions, and the removal is a consequence of the criminal provision. So the criminal provisions say, if you unlawfully enter the United States, or if you unlawfully re-enter the United States, then Texas can initiate a criminal proceeding against you and go to state court and obtain an order either of imprisonment or of removal from the United States. All the hypotheticals you've been giving me are about arresting people, bringing them to the port of entry, all of that. There's no provision of SB 4 that Texas is trying to resuscitate that says that they can do any of that. The provisions we're talking about are criminal provisions. And so the analog to the criminal provision that is actually at issue in this case is Section 3 of Arizona, which was also a criminal provision that, as this Court well explained in the stay opinion with lots of quotes and examples from Arizona, it's also intruding on an area that the federal government has authority over in the immigration space. In fact, it goes to entry and removal, not just to registration. And so our submission, and the Court properly accepted, is that the criminal provisions of SB 4 are field preempted. Is there anything that a state can do? I want to make sure. The field that the government understands is the field of entry and removal. Is that right? Yes, of regulating the entry and removal. Is there anything that a state can do to regulate entry and removal? Anything at all? Well, when you say regulate, I mean, they can't exercise their own independent regulatory authority. There are things that they can do in cooperation with the federal government in the law enforcement capacity. But in terms of exercising their independent regulatory authority, that's what field preemption means. So there would be no. And that field preempts any state statute that would require sanctuary cities? I guess sanctuary cities is not a precise term. Sure. We've litigated cases about sanctuary cities, and there have been individual provisions, and we've gone through them, and we've said some of them are preempted and some aren't with some success. But, I mean, there are provisions that relate to sanctuary, that are called sanctuary city provisions that, for example, Texas has one that this court upheld that says, you know, states will comply with detainer, I mean, localities will comply with detainers issued by the federal government. And those are, there's nothing wrong with those provisions. Could they do the opposite? And refuse to comply? No. Could the state pass a statute that says every sheriff and police officer in our state is hereby directed by state law not to comply with detainer requests from the federal government? Comply with detainer request is not a totally precise term. Detainer requests are not mandatory under federal law. So to the extent that the state is exercising discretion that it has about whether to comply, then that is the sort of thing that they could do. There are some limits on that. And there's been litigation in the Ninth Circuit about California's efforts in this regard. So does the answer, it's complicated? With regard to detain, I mean, the answer is I would need a specific provision and a specific understanding of what they're doing. I'm sorry, I'm trying to get it to you, and maybe I can be more specific. The state passes a statute, and it bars the federal government from coming on to the land of a police department or sheriff's office to either execute a detainer request, bars application of any of the databases that the local law enforcement share with the federal government to coordinate detainers and removals. It bars any form of local law enforcement cooperation in any kind to facilitate removal. We've taken the position that going that far would be. So that's field preempted. We said that was conflict preempted and not field preempted. And so why would we do something different here? So I want to make sure I understand. That's not a criminal, I'm sorry, I didn't mean to interrupt. Please, go ahead. It's clear that when, I mean, detainers arise when there is an individual that's in state custody because they've committed a crime under state law, and then the federal government also has an interest in the same person. And the question of the transfer of custody or the sharing of information is not one in which the federal government, by hypothesis, has exclusive authority because this is an area in which the states are exercising valid state laws and have legitimate interests in their own penal systems. And so those cases have not been analyzed as a matter of field preemption. There are some circumstances in which there may be a conflict with what's happening. Now what's happening, just to turn back to this actual case, what's happening here is that the state has enacted a criminal provision that is endeavoring to not enforce a generally applicable state law, but rather to enforce the federal immigration laws, and that is what is causing the field preemption here that would be absent, I think, from the scenario that you're positing. I realize we're running out of time, I wanted to make sure we got to this question about foreign affairs. There's a lot of, there's an amicus brief from the country of Mexico, there's a lot in the government's position about foreign affairs impacts of this law. If the position, if it were true that all Texas could do under SB 4 is arrest, et cetera, et cetera, but when it comes to doing the returns, they just return somebody to a port of entry, does that obviate the foreign affairs consequences in your view? I guess I'm not sure what arrest, et cetera, et cetera, is. If they're bringing criminal proceedings against non-citizens based on their immigration status, then that implicates foreign affairs concerns. So I think my answer to your question would be no, that would not eliminate the foreign affairs concerns, if I'm understanding the question correctly. Sorry, I thought that the foreign affairs concerns, at least the ones you brief, are that we can't have 50 different states returning people in different circumstances, we can't have the people, the government of Mexico having to deal with 50 different, or 51 different sovereigns when it comes to these return matters. So I understood the briefing to be focused simply on return, not so much on arrest, detention, the state misdemeanor, et cetera. That may be true as a matter of emphasis, but that is not true in general. Mexico has expressed concerns with the arrest and incarceration of its nationals, even if they're not removed. And I would like, this is another place in which Arizona is instructive, and there were a number of quotations from that opinion in the state opinion as well. Arizona did not involve any effort by a state to remove somebody from the United States, but the foreign affairs concerns were front and center in that opinion, and the court emphasized that, of course, there's concerns about reciprocal treatment of US citizens abroad and, you know, taking a non-citizen and based on their immigration status, putting them in prison is a serious matter and can be, indeed, a foreign affairs matter. I have a question. Counsel for the state of Texas said, well, Ex parte Young shouldn't apply, and essentially my take from the argument was there needs to be a statute that permits the United States government to go into court and get injunctive relief. Can you give us examples, other than Arizona, where the United States went into court without an expressed statutory right to bring injunctive relief? Sure. I mean, Debs is the most prominent example, and it cited a string of earlier cases, and the reasoning of Debs actually paralleled the way this court discussed the issue in its day opinion, which is when there is an action that intrudes on the sovereign rights of the federal government, then the United States can come into court to seek an injunction, and Debs actually talked about this in quite broad terms, and, you know, opposing counsel is talking about how extraordinary our position would be, but it's really their position that would be extraordinary and unprecedented. They have not cited a single case in which the government has endeavored to bring an action of this kind, and a court has refused to allow it, not one from any court, and the way Debs talked, and so their position would mean that, you know, we think that SB 4 is a pretty extreme intrusion on the federal government's authority, but their position would apply if it was more extreme. If they were explicitly barring federal officers from carrying out federal law within their state, their position would be that the United States couldn't bring an action to seek an injunction to prevent them from doing that, and that, it is that that is the extraordinary and unprecedented position, and not ours. What is the last time that the United States used sort of just implied principles of equity? I mean, is there another example, I mean, you say there's no time we've ever refused it. Outside of Arizona, what would be a good example of when the United States has done something like this, and the court's just been like, yeah, no problem, let it go through? Well, I mean, I mean, there have been a range of immigration cases, South Carolina, Alabama, Utah, California. Tell me about them. I mean, they were all state enactments that the United States thought was preempted by federal law. One of them, you know, several of them were similar to the Arizona one, and the South Carolina litigation, for example, the South Carolina urged that the private, as here there were private plaintiffs and federal plaintiffs, South Carolina urged that the private plaintiffs had no cause of action, didn't even make the argument with regard to the United States. In Alabama, argument wasn't raised. In California, which is the case I mentioned earlier about, you know, what was characterized as a sanctuary city provision, same thing, United States filed a preemption lawsuit, argued that some California provisions that limited cooperation with the federal government were preempted, resolved on the merits, you know, no issue about equitable authority. And so these are all field preemption, pre-enforcement, facial challenges against the entire statute? They were not. I guess that answers it, but thank you. I guess I'm not sure why you would say, I mean, there was a field preemption, there are some field preemption arguments in some of these cases, and as you say, we have to go provision by provision. The fact, the question of whether there are other provisions in the statute or not wouldn't seem to affect whether there's equitable authority. I know I'm out of time. I'm happy to answer any further questions the court may have. Thank you. Thank you, Your Honors. May it please the court, Cody Wofsy, ACLU for the Los Americas Plaintiffs. This court in its state decision faithfully applied 150 years of Supreme Court precedent. We'd urge the court to adhere to those decisions and affirm the injunction in whole. I have a couple of points I'd like to make on the threshold issues, just briefly touch on Mr. Hicks, and then address some of the equity questions. So with regards to Mr. Hicks, we heard argument this morning that he believes he's entitled to sovereign immunity. We've explained in our brief why that's both wrong and those arguments were not placed before the district court in the first instance. But I want to make another point, which is that in our view, it actually doesn't matter whether Mr. Hicks gets sovereign immunity in this case. The injunction here runs against the state of Texas and all of its agents. And so on Mr. Hicks' telling, he is an agent of the state of Texas, and therefore he would be bound even if he's entitled to sovereign immunity. That's because of the particularity of the United States having brought suit in this case. So we don't think actually the court needs to reach any of those questions. I'm happy to address any of them if the court would like. We do believe he's wrong and essentially trying to relitigate this court's cases about Texas district attorneys. There are now three of those. I don't think, maybe I misunderstood what Mr. Hicks' attorney was arguing. I didn't think he was saying that there was somehow, that he wasn't bound by the injunction. I think he's quite painfully aware of being bound by the injunction. I thought that the problem he was pointing out was that you would still need some ex parte young authority to do the binding. That is, that you would need some implied cause of action and we can, I trust we're going to get to in a minute the nature of your implied cause of action, but you would need something that would be an enforcement, our case is called an enforcement nexus or something like that. Right, Your Honor. The point I'm trying to make is the United States sued in this case, in their own suit, and sued the state of Texas. And the injunction by its terms is on page 109, I believe, of the district court's opinion, says it applies to the defendants and all their agents. So my point is just, even if you agreed with Mr. Hicks across the board on his threshold arguments, it would still be the case that Texas is subject to the injunction and that Mr. Hicks, as himself saying, I am an agent of Texas, that he would be subject to the injunction. So his arguments, in other words, make no practical difference in this particular circumstance. But I do want to address Your Honor's question. So the first point is that Texas DAs do not have sovereign immunity. This court has now said that three times. It was in Crane, it's again in Hudson, it's again in National Press Photographers. As I understand Mr. Hicks' argument, it's that he thinks those cases were wrongly decided, the wrong arguments were made. That's not usually a basis for this court to disregard prior precedents. It's an issue that I think would need to be taken up en banc. And it just, to me, does not make sense to do that in a case where it makes no practical difference. And then on the Ex parte Young point, I take his main issue to be saying there's not evidence that he himself is going to prosecute these cases. I just point out, on Mr. Hicks' Facebook page right now, there's a video of a press conference in which he says he will prosecute SB4 claims. This just kind of goes to the problem of raising this in the Court of Appeals for the first instance rather than bringing it to the District Court. So we'd encourage the courts to just kind of bypass those issues. I don't think it needs to reach any of them. But is he right, though, that you still have to plead that in your complaints in the District Court? I mean, because I take his point as that this is an allegation that goes to sort of the nature of the complaint. I'm sorry. It's a problem that goes to the nature of the complaint. And if the complaint says, here are all these people who are going to enforce it, but they're notably absent in the allegation as to me. I don't believe he is right about that. I don't know of any case that's ever said that, particularly in the context of somebody like a local prosecutor. Obviously, this court has cases that are about kind of statewide officials, the governor, and then maybe the court is looking for a little more to get an indication of, oh, they're going to step in and do something unusual here. We're talking about the very ordinary practice of just a prosecutor prosecuting cases. And if there were any kind of pleading requirement here, obviously, we could amend our complaint. There are facts now. It just seems not like the best use of this court's time to be getting into that kind of question on the first instance. I do want to speak to the equitable concerns. So there's a broad ability to seek an equitable remedy, equitable cause of action, to enjoin preempted state laws. And Ex parte Young provides an exception to sovereign immunity when its requirements are satisfied. Obviously, you need to have a proper Ex parte Young defendant. You need to have a proper Ex parte Young remedy. We have both of those. There's no dispute about any of that. So as I understand the entire dispute as to Ex parte Young, it's this question of what about an indirect injury. And respectfully, I just don't think that's borne out in the cases. Ex parte Young itself involved an indirect economic injury. The underlying plaintiffs there were shareholders in the company that would itself be subject to enforcement action. They were never going to be subject to enforcement. They were never going to be subject to coercion. They had an economic injury. And I'd also point the court to the recent decision in Book People. And in that case, again, the court's clear we're talking about indirect injuries. The only coercion there is as to libraries. The plaintiffs there are bookstores that want to sell to libraries. They have an indirect economic injury. They can use Ex parte Young. That's a pre-enforcement case. It's a facial case. And it involves something like a Havens injury, at least a related kind of theory of standing. So I don't think that there is any basis there. And kind of stepping back from the particulars of the cases, I think what the Supreme Court's cases are clear on is Ex parte Young serves this role of vindicating federal supremacy. That's the sort of point of it in our constitutional structure. And so to say that a particular plaintiff can't vindicate federal supremacy just because of the nature of their injuries, somewhat indirect, I think that's in the teeth of Virginia Office of Protection, where the court said exactly the opposite. It does not matter who your plaintiff is. And so for all those reasons, we do have a cause of action. I think the court is exactly right in the state opinion. It doesn't need to reach any of those questions. And so unless the court has further questions. My only one is sort of that very last piece, which is I take your point about that maybe there are these circumstances where folks with indirect injuries can nonetheless invoke Ex parte Young. The thing that's odd about this one is because it's pre-enforcement, the underlying causes of your indirect injuries are hypothetical. So if you're understanding my question, it would strike me that your case would be obviously stronger if the law goes into effect and then you have actually injured individuals who then create these indirect injuries that you've alleged. Then maybe you sort of cobble together all of those things. But the thing I've been looking for and I still haven't found is something that combines all of these various indirect things, right? So indirect cause of action, indirect injuries, indirect associational standing with pre-enforcement, with facial invalidation, all of those things together. It then strikes me that one of the sort of big bedrock principles that the Supreme Court has told us is that federal courts don't just quote and join the world. And if you combine all of the various things that we have in this case, it looks like an injunction against the world. Respectfully, I disagree. So I have two answers to that. One is I do think book people essentially has every one of those components that Your Honor is pointing to. And obviously the court found both jurisdiction and ex parte young. And the second is, I take Your Honor's point that there could be cases where in a pre-enforcement posture, it's just too uncertain what exactly the effect is going to be. I just think on the facts of this case, we're not there. There's no dispute that this is going to be very broadly enforced, 80,000 arrests a year. No one has disputed that. This is going to be a massive new system if it's allowed to go into effect. And we've laid out in detail in our declarations, which are undisputed and which the district court made fact findings about, that this is going to dramatically alter our client's operations. There's nothing hypothetical about that as well. And so I think to the extent Your Honor has a concern about maybe in some cases this would be too uncertain, I think that can be addressed with other doctrines. Article 3 itself, as Your Honor's pointing out, does deal with these kinds of questions. There may also be other kind of prudential doctrines that come into play in other cases, but not in this one. And so I just don't think that's a concern here. In our view, it's clear what SB04 would mean for Texans and communities here and for our clients. And so for all those reasons, we'd urge the court to affirm, unless there are further questions. Thank you. Well, I would like to start with the accusation that I'm rewriting from the lectern. I would point the court to page 8 of our opening brief. I'm going to start reading here. Such an order does not itself remove anyone from the United States. Instead, the order merely requires a state official to transport the alien to an official port of entry. I can continue reading. I believe that's the same argument that I've made today from the podium. We also hear a question about ROA 316, the Escalon Declaration. I would urge the court to read the rest of the page. It's true, he says, that if Mexican authorities do not accept the entrance, as he goes on to quote. But before that, I'm going to read paragraph 13. Should DPS become aware that a detained alien has a pending application for asylum or other relief with the federal government at the time of executing his return order under SB 4. DPS intends to coordinate with federal immigration authorities before executing the order. Again, if you don't have such a claim with the United States and you are trying to go into Mexico and Mexico says no, that's another reason why you're not going to be subject to a separate charge against you under SB 4. But what we're talking about here is if you have such a claim, if you say I have an asylum right or a treaty right or something of that sort, you go to the United States. There's also a question about what this accomplishes. Well, obviously, if the United States isn't going to do what Congress has said, maybe not so much. But even so, it is putting people into the system. They will be registered. And of course, we know that presidents come and go, and different administrations might very well enforce federal law differently. I'd also say that the title, it's not removal order. It's return order. But regardless, the title doesn't matter here. What matters is the operative provision. If I'm wrong about all of that, however, remember, this is a facial pre-enforcement injunction, and there is a robust severability provision. So if I'm wrong about all of that, the answer isn't enjoin the entire statute. It would be let's sever the return order provisions. I don't see any reason why that wouldn't be OK. That's what happened to the Supreme Court in Arizona. That should be what happens again here. Another point that I think is important, and this goes back to the stay order, throughout the stay order, there's discussion of prosecutorial discretion. And I think the court needs to disaggregate that a little bit. There are some prosecutorial discretion by statute. So for instance, the attorney general has power to parole as a matter of discretion. That is a federal statutory defense that will remain part of the SB4 enforcement, because of course states can't say federal defenses don't apply in state court. That's a supremacy clause. But there's a different type of discretion, and that is they just have different policy objectives. And the Supreme Court has now said, unmistakably, in Kansas v. Garcia, that does not count for purposes of preemption. So I think that needs to be part of the court's merits opinion. Kansas v. Garcia, when you discuss prosecutorial discretion, that needs to be there. I think I heard my friend from the United States concede that there is no statutory cause of action here. One thing they also don't hear is any discussion of the slew of recent Supreme Court decisions about implied rights of action. The Supreme Court has said in case after case after case that we are out of the business of creating causes of action where Congress hasn't done so. So he says it's truly extraordinary. I can point numerous cases recently from the Supreme Court where the Supreme Court has said that's just not how this works. Congress decides who gets to go into federal court with the causes of action. And as I said, and I didn't hear any response, there's numerous statutes where Congress has authorized the executive branch to— What are we supposed to do with Arizona? I know you say it wasn't raised, but it's on the books. They got an injunction. The United States got an injunction, pre-enforcement against a state statute. Correct, correct, Your Honor. This issue was not presented in Arizona. I know it wasn't presented, but— So I don't think that's a holding of the court. I think this court would be free to reach what I'd say the right outcome. It wasn't briefed. And I don't think it was briefed because it was pre-Armstrong. So the idea that the supremacy clause doesn't have its own cause of action just wasn't on anybody's radar. The Supreme Court has now said there is no supremacy clause cause of action. Well, now the question that wasn't asked in Arizona is forefront for the court. Finally, the last point, if I may, I only have a few more seconds here, field preemption. They continue to assert that entry and removal is field preempted. They have no case for that. No case has said that. Instead, we're in the world of conflict preemption, and SB 4 mirrors rather than conflicts with federal law. If there are no further questions, we really appreciate the courts, and we ask the court to reverse. Thank you, Your Honor. The court will take a brief recess. Thank you.